IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO: 1:22-CV-936

| | |
|---|---|
| ARLENE S. LAING,<br><br>Plaintiff,<br><br>v.<br><br>NOVANT HEALTH, INC.<br><br>Defendant. | **COMPLAINT**<br>(Jury Trial Demanded) |

COMES NOW the Plaintiff, Arlene S. Laing, with this her Complaint against the Defendant, Novant Health, Inc., alleging and stating as follows:

1. Plaintiff Arlene S. Laing (hereinafter "Plaintiff" or "Ms. Laing"), is, and at all times relevant to this action was, a citizen and resident of Guilford County, North Carolina.

2. Defendant Novant Health, Inc. (hereinafter "Novant") is, and at all times relevant to this action was, a non-profit corporation organized and existing under and by virtue of the laws of the State of North Carolina, with a principal place of business in Forsyth County, North Carolina. Novant operates health care facilities in North Carolina, South Carolina, and Georgia and employed in excess of 30,000 employees at the time of Plaintiff's termination by Novant in February 2021.

3. This court has subject matter jurisdiction of this action pursuant to 42 U.S.C. § 2000e-5(f) and 42 U.S.C. § 1981.

4. This Court has jurisdiction over Ms. Laing's state law claims pursuant to 28 U.S.C. § 1367.

5. Ms. Laing was Novant's employee for purposes of 42 U.S.C. § 2000e(f).

1

6. Novant was Ms. Laing's employer and Novant employs more than 500 persons for purposes of Title VII, including 42 U.S.C. § 2000e(b), 42 U.S.C. § 1981a, and the North Carolina Equal Employment Practices Act, N.C.G.S § 143-422.2.

7. Ms. Laing has exhausted all administrative prerequisites for filing an action under 42 U.S.C. § 2000e-5(f). She filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), charge number 435-2021-00821. The EEOC issued a notice of Ms. Laing's right to sue dated August 8, 2022.

8. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2).

9. Ms. Laing was employed by and worked for Novant at one of its health care facilities in Guilford County, North Carolina, and most if not all the actions alleged herein occurred in Guilford County.

10. On December 22, 2020, Ms. Laing began her employment with Novant.

11. Ms. Laing was a Certified Medical Assistant ("CMA") when she was hired by Novant.

12. Ms. Laing was hired by Novant to work as a CMA at its health care facility known as Novant Health Pediatrics Oak Hollow ("NPOH"), which is located in High Point, Guilford County, North Carolina.

13. Ms. Laing was qualified for the position for which she was hired by Novant.

14. NPOH is a pediatric health care facility owned and operated by Defendant Novant.

15. Ms. Laing is an African American / Black female.

16. Except for one other African American / Black female employee who, upon information and belief, was only temporarily placed at NPOH and was replaced by a full-time white female employee shortly after Ms. Laing began working for Novant, Ms. Laing was the only

2

African American / Black employee at NPOH throughout the duration of her employment with Novant.

17. Except for one other African American / Black female employee who, upon information and belief, was only temporarily placed at NPOH and was replaced by a full-time white female employee shortly after Ms. Laing began working for Novant, Ms. Laing was the only non-white employee at NPOH throughout the duration of her employment with Novant.

18. Kandi Hughes ("Ms. Hughes"), Clinical Administrator at NPOH, was Ms. Laing's supervisor.

19. At all relevant times herein, NPOH also employed two other CMAs, Ms. Lisa Boyles ("Ms. Boyles") and Ms. Liz Huggins ("Ms. Huggins").

20. Ms. Boyles had previously worked as a CMA in pediatrics for approximately 15 years prior to the events complained of herein.

21. Ms. Huggins had only been with Novant for a few months at the time and she was herself still learning how things were done at Novant. Ms. Huggins had not yet completed her own training after several months with Novant.

22. On February 2, 2021, Ms. Laing was called into a meeting with Ms. Hughes and a physician at NPOH, Dr. Mary Allison Hudson ("Dr. Hudson").

23. During the meeting, Ms. Hughes used the term "non-negotiable termination," although there was no mention of the "stealing" or "falsifying" records in the termination meeting.

24. During the meeting, Dr. Hudson added she had heard about Ms. Laing weighing children on the scale with their shoes on, which was not something that had occurred but had apparently been reported to Dr. Hudson.

3

25. Ms. Laing was puzzled by these claims, but Ms. Hughes stated that the termination was "non-negotiable" and told Ms. Laing she had to sign the Termination of Employment form ("Termination Notice").

26. There was no discussion of the contents of the Termination Notice, which Ms. Laing was shocked to read after the fact.

27. The Termination Notice stated that during her orientation period, Ms. Laing violated two Novant policies including "stealing from Novant" and "falsifying information on a patient's SWYC form."

28. Novant relied upon the policy violations, which were false, to justify a "non-negotiable" violation which is, according to Novant, "serious in nature and, except in unusual circumstances, will result in immediate termination, following an investigation."

29. Novant terminated Ms. Laing's employment on February 2, 2021, after only six (6) weeks on the job.

30. Ms. Laing's training had not been completed when she was terminated by Novant after six (6) weeks of employment.

31. Ms. Laing was initially excited about going to work for Novant at NPOH.

32. Ms. Laing takes her work as a CMA very seriously and finds great joy and meaning in her life by providing health care services to children and adults.

33. When Ms. Laing was hired by Novant to work at NPOH, Novant was aware that Ms. Laing had not previously worked in the area of pediatrics. However, Ms. Laing was qualified for the position and had the necessary skills, with training unique to pediatrics and Novant's practices, policies, and procedures, to perform well as a CMA in a pediatrics practice such as NPOH.

34. Throughout her time with Novant, Ms. Laing sought to learn quickly to be able to provide excellent care to patients of NPOH.

35. Novant never gave Ms. Laing a fair opportunity to succeed at NPOH.

36. Novant applied very different and much higher job performance standards to Ms. Laing than it did to its white employees.

37. The expectations applied to Ms. Laing were much greater than those applied to white employees of NPOH.

38. Ms. Laing was terminated for behavior that was routinely tolerated when done by white employees.

39. The circumstances of Ms. Laing's termination by Novant demonstrate and give rise to an inference of discrimination based on Ms. Laing's race.

40. Other employees of Novant, who were not in the same protected class as Ms. Laing, were treated more favorably than Ms. Laing.

41. On January 11, 2021, when Ms. Laing was still in training, she returned to her desk early from lunch. Ms. Laing was just learning how to clock in at this time and she had been having some trouble with her password.

42. Upon returning to her desk after lunch on January 11, 2021, one of Ms. Laing's children called her. Ms. Laing did not realize she had successfully logged in and believed she still had some time before the end of her lunch break, so she stepped outside to talk to her child.

43. Shortly thereafter, Ms. Laing's supervisor and the NPOH Manager, Kandi Hughes, came outside to get Ms. Laing to tell her she needed to be inside because she was already clocked in. Ms. Laing did not realize she was clocked in at the time, but she immediately came back inside.

5

44. Patients had not yet started coming in after lunch, so Ms. Laing looked for Ms. Hughes to explain what had happened, but she did not find her, so she returned to her desk to wait for patients to come in.

45. Ms. Laing never heard anything more about this incident on January 11, 2021, and did not realize it was a significant issue until it appeared in her Termination Notice as constituting "stealing from Novant."

46. This extremely serious accusation of "stealing" leveled against Ms. Laing was at no time brought to her attention or discussed with Ms. Laing. Rather, it appeared in her Termination Notice provided to her on February 2, 2021, and was cited by Novant as a reason to justify the "non-negotiable" nature of Ms. Laing's termination.

47. Novant applied a much different standard to Ms. Laing than it applied to its white employees.

48. Novant accused Ms. Laing, when she was NPOH's only Black employee, of "stealing from Novant" because she took a call from her child while she was clocked in, and wasn't aware she was clocked in at the time.

49. Between January 11, 2021, and February 2, 2021, Novant never discussed the events on January 11, 2021, or asked Ms. Laing what happened.

50. "Stealing," which Novant accused Ms. Laing of doing, connotes criminal and immoral behavior.

51. It was reasonable for Ms. Laing to believe she was being accused of criminal and immoral behavior based on the accusations against her in the Termination Notice she was provided on February 2, 2021.

52. The allegations of stealing and falsifying patient records were shocking and horrifying to Ms. Laing, because they were false and also because she was concerned about the impact such allegations would have on her career and her ability to support herself and her family.

53. Novant demonstrated a reckless disregard for the impact its false and unwarranted allegations about Ms. Laing would have on Ms. Laing, professionally and emotionally.

54. Novant claims that any time an employee is not engaged in the business of Novant while on the clock amounts to stealing from Novant. Upon information and belief, this standard only applies to Novant's Black employees, such as Ms. Laing. This standard was not applied to other Novant employees, including those similarly situation to Ms. Laing.

55. White employees of Novant were often not engaged in work for Novant while on the clock.

56. Upon information and belief, none of the white employees observed by Ms. Laing engaging in conversations or behavior, while on the clock, about matters that had nothing to do with the business of Novant, were accused of "stealing from Novant" and none of these white employees lost their jobs for doing so.

57. Novant accused Ms. Laing of "stealing from Novant" for behavior that was unintentional and that was routinely engaged in by white employees of Novant.

58. As an example, Ms. Laing's supervisor and others at NPOH engaged in petty gossip and banter with her white co-workers about matters that had nothing to do with the business of Novant, while at work and on the clock. Such behavior may not be surprising or even unusual in many workplaces, but Novant appears to believe that a Black female employee taking a call from her child while on the clock was worthy of its highest level of condemnation, its malicious disparagement of Ms. Laing's character, and the loss of her livelihood.

7

59. Novant's willingness to accuse Ms. Laing of criminal and immoral behavior was based on Ms. Laing's race.

60. Ms. Laing had been on the job for approximately three weeks and was still in training when she was accused of stealing from Novant.

61. Further, the alleged "stealing" was not discussed or addressed with Ms. Laing prior to her termination approximately three weeks later.

62. Novant knew or should have known that its white employees on occasion are not working while on the clock.

63. Further, Novant knew or should have known, that Ms. Laing, her supervisor, and her white co-workers all had difficulties at times logging in to Novant's time-keeping system.

64. A couple of the people responsible for training Ms. Laing were also relatively new to NPOH, and there was much they did not know about NPOH's systems and procedures.

65. Frequently, when Ms. Laing had questions, neither Ms. Hughes nor Ms. Huggins knew the answer or provided what turned out to be inaccurate information. These white employees, who were responsible for training, also made mistakes, but were never considered to be incompetent and did not lose their jobs.

66. Novant, including Ms. Laing's supervisor and co-workers at NPOH, demonstrated a belief that Black people are inferior to white people, generally incompetent, unteachable, unworthy of respect, and of a lower moral character than are white people.

67. Novant's actions and behavior demonstrate that it has a much lower threshold for condemning its Black employees of criminal and immoral behavior than it does for its white employees engaging in the same or worse behavior.

8

68. Novant also falsely and maliciously claimed in Ms. Laing's Termination Notice that Ms. Laing intentionally falsified information on a patient's intake form.

69. At no time did Ms. Laing knowingly or intentionally falsify any patient records.

70. At no time did Ms. Laing intentionally or knowingly place any information on a patient record that she knew or believed to be inaccurate.

71. Ms. Laing was still in training and learning how things were done at NPOH, but Novant, refusing to give the same benefit of any doubt to its Black employee as it does to its white employees, leaped to the conclusion that Ms. Laing intentionally falsified patient records.

72. Novant's allegations against Ms. Laing of intentionally falsifying records was, upon information and belief, based on some discrepancies between what the patient may have told the doctor in person and what the patient told to Ms. Laing and/or placed on a previously completed intake form.

73. Rather than giving Ms. Laing, who was still in training, the benefit of any doubt as Novant frequently did with white personnel, Novant assumed the worst about Ms. Laing and accused her of intentionally falsifying records.

74. As with the alleged "stealing," at no time prior to her termination was there any suggestion that Ms. Laing was intentionally doing anything wrong or that any mistake she may have made during her period of training were significant or irreparable.

75. Novant's willingness to accuse and its accusations against Ms. Laing for "stealing" and for "falsifying" patient records were unwarranted, needlessly malicious, and based on Ms. Laing's race.

76. Upon information and belief, Novant has not, under the same or similar circumstances, terminated a white employee for allegedly stealing from Novant for taking a phone call from a child while on the clock.

77. Upon information and belief, Novant has not, under the same or similar circumstances, terminated a white employee for allegedly falsifying patient records.

78. White employees were given the benefit of the doubt by Ms. Laing's supervisor and Novant's decision-makers, whereas they assumed the worst about Ms. Laing.

79. Novant made false and malicious allegations against Ms. Laing, and were willing to impugn her character and motives, for small errors or behavior that was overlooked or readily excused when done by white employees of NPOH.

80. Novant falsely and maliciously accused Ms. Laing of stealing from Novant and of falsifying patient information because of her race.

81. During Ms. Laing's 6-weeks of employment at NPOH, when a white employee made a mistake, the matter was laughed off by the all-white co-workers of Ms. Laing; however, if Ms. Laing made a minor mistake or did not know exactly how to perform a task, even though it was known she was still in training, Novant was building a record to attempt to justify accusing Ms. Laing of incompetence, dishonestly, and even criminal behavior.

82. At no time did Ms. Laing's supervisor, superiors, and/or co-workers at Novant take any action to make Ms. Laing feel welcomed and comfortable in Novant's all-white office at NPOH.

83. Ms. Laing's immediate supervisor was aware of the racist comments and was directly involved in the discrimination against Ms. Laing.

84. Upon information and belief, Novant saw more value in Ms. Laing as a diversity hire than as an employee they respected, cared, about, wanted to succeed, and to whom they were willing to give a genuine opportunity to succeed.

85. Rather than viewing and treating Ms. Laing as the asset she was and/or could have been given a fair chance, she was viewed as a diversity statistic who Novant did not need to take seriously and who could be discarded based on false and malicious allegations of stealing and falsifying patient information as soon as they wanted to get rid of her.

86. Upon information and belief, Novant's claims of diversity and inclusion are marketing slogans that are not truly indicative of genuine efforts to address racist attitudes that persist among its workforce and are allowed to persist and are condoned by its officers and managers.

87. Throughout her short six-weeks of employment with Novant, Ms. Laing had to listen to racist comments from her supervisor and co-workers, whom all appeared to be close friends.

88. Ms. Laing's supervisor and co-workers at NPOH frequently made race-based comments to and in front of Ms. Laing that demonstrated their shared beliefs that Black people are: drug-dealers or on drugs; bad parents who do not care as much about their children as white parents; less capable than white parents to properly care for their children; more likely to have mental health issues than white people; poor and therefore unable to provide adequate care for their children; and all know each other, such that failings or shortcomings of one Black person are attributed to all Black people, including Ms. Laing.

11

89. Ms. Laing's white supervisor expressed her concern about a young Black patient's mother's mental health, in response to which another white CMA joked that "Arlene [Ms. Laing] knows her."

90. On another occasion, after a white co-worker answered a phone and nobody spoke on the other end, the white co-worker proclaimed "it must have been one of Arlene's [Ms. Laing's] drug-dealing friends."

91. A Black parent who brought her child to an appointment at NPOH in a taxi was ridiculed for doing so and for not having the ability to have their own transportation.

92. There was a significant amount of whispering behind Ms. Laing's back by Ms. Laing's supervisor and co-workers, whom all appeared to be close. Ms. Laing could not hear what they were saying, as it was clear they did not want Ms. Laing to hear what they were saying.

93. Ms. Laing's supervisor and her co-workers made it clear they did not view Ms. Laing or other Black people with the same level of respect or value as they did white people.

94. Ms. Hughes was blind to, or willfully ignored, petty and racist banter and comments made by herself and her white co-workers.

95. About one week before Ms. Laing was terminated, her supervisor, Ms. Hughes, shadowed Ms. Laing for the day. During the course of this day of shadowing, Ms. Hughes only noted a couple relatively minor things for Ms. Laing to work on – she offered a tip for measuring the head circumference of babies and noted to make sure the patient's heels are all the way back on the scale during weighing.

96. NPOH knew when Ms. Laing was hired that she had not previously worked in pediatrics. In any event, no major issues were raised by Ms. Hughes when she shadowed Ms. Laing.

97. Other than minor feedback as part of the training process and shadowing, Ms. Laing was only told that she was "doing a great job" up until the time of her termination on February 2, 2021.

98. However, despite being told she was "doing a great job," Novant was attempting to build a record to justify Ms. Laing's termination on "non-negotiable" grounds. Novant failed to provide Ms. Laing a reasonable opportunity to correct any areas in need of improvement during her training and leading up to her termination.

99. At no time prior to her termination on February 2, 2021, did Ms. Laing believe, nor was she given any reason to believe, that her employment was in jeopardy.

100. Ms. Laing was performing her job duties in a satisfactory manner at the time of her termination, which was only six weeks after she started.

101. Prior to terminating her employment, Novant made no good faith efforts to make Ms. Laing aware of or to address any significant issues with her performance of her job duties, for which she was still being trained.

102. Upon information and belief, at no time did Novant intend to make good faith efforts to appropriately train and provide Ms. Laing with the opportunity to succeed at NPOH. Rather, she was made to feel unwelcomed and uncomfortable because of her race, held to a different standard because of her race, set up to fail because of her race, and then terminated in a a cruel and unwarranted manner based on false allegations of stealing from Novant and falsifying patient records.

103. Ms. Laing's supervisor, Ms. Hughes, delegated some of Ms. Laing's training to her white friend/co-worker, Ms. Huggins.

13

104. Ms. Huggins frequently made mistakes, was confused, or did not know how something was to be done, yet she was tasked with training Ms. Laing. Ms. Laing observed Ms. Huggins forget to put in the blood pressure readings for a patient, not following the proper procedure to check the refrigeration temperature for the vaccine immunizations, among other things.

105. There were times when Ms. Laing had a question and neither Ms. Hughes nor Ms. Huggins knew the answer, or they provided what turned out to be inaccurate information. For example, whether Ms. Laing had the correct Vaccine Information Statement form.

106. Neither Ms. Huggins, Ms. Hughes, nor Ms. Boyles, another CMA who had worked in pediatrics for 15 years, knew the appropriate vial to use for a patient's blood draw.

107. If Ms. Hughes, Ms. Huggins, or Ms. Boyles did not know the answer to something, it was not a big deal. At times, they would do a Google search for the answer, as was done to determine the appropriate vial to use for a blood draw.

108. It did not appear to Ms. Laing that any of the clinical staff, all white, had a high degree of competence in pediatrics, except for Ms. Boyles, who did appear competent in pediatrics, even though she was unsure of which vial to use for a blood draw on one occasion.

109. These white employees, who were responsible for training Ms. Laing, also made mistakes, but, unlike Ms. Laing, they did not lose their jobs. A different standard was applied to white employees at Novant than was applied to Ms. Laing.

110. Ms. Hughes was forgiving of her own inadequacies and the inadequacies of her white friends/co-workers, but she demonstrated no willingness to give Ms. Laing the benefit of any doubt – rather, she assumed the worst about Ms. Laing, including Ms. Laing's competence, her ability to learn, her honesty, and her integrity.

111. None of the medical staff, including Ms. Hughes, expressed concerns to Ms. Laing about her procedure for blood pressure readings or any other basic tasks. If they reported her to management, she was not notified or given any additional training or an opportunity to correct her actions.

112. There were multiple occasions when Ms. Hughes, Ms. Huggins, and Ms. Boyles were present in the patient rooms while Ms. Laing was performing basic tasks, and at no point was she ever corrected on any mistake or given any feedback other than to make sure the patient's feet were touching the back of the stadiometer.

113. The actions, behavior, and alleged omissions of Ms. Laing used to justify her termination were false and/or grossly overstated.

114. The actions of Ms. Hughes demonstrated she was more interested in setting Ms. Laing up for failure than helping her succeed as a member of Novant's team.

115. Ms. Hughes only shadowed Ms. Laing on one occasion, during which she complimented Ms. Laing, said she was "doing a great job," and had only a couple minor suggestions to offer to Ms. Laing.

116. Novant terminated Ms. Laing's employment because of her race.

117. At a minimum, Ms. Laing's race was a motivating factor for her termination.

118. But for Ms. Laing's race, she would not have been terminated by Novant.

119. But for Ms. Laing's race, she would not have been accused of stealing from Novant for taking a phone call from her child not realizing she was on the clock.

120. But for Ms. Laing's race, she would not have been accused of falsifying patient records based on discrepancies that could easily be explained and were unintentional.

15

121. But for Ms. Laing's race, every minor mistake or question she had about her job would not have been assumed to demonstrate incompetence, a lack of integrity, or moral defects. Such assumptions were not made by white employees with whom Ms. Laing worked, and said white employees were not terminated as was Ms. Laing.

122. Novant did not have a legitimate, non-discriminatory reason to terminate Ms. Laing's employment.

123. Novant's alleged job performance issues, alleged stealing, and alleged falsifying of patient records were false or grossly exaggerated, and Ms. Laing was held to a higher standard than Novant's white employees.

124. Ms. Laing's was performing her job in a satisfactory manner at the time of her discharge from employment, especially given that she was not afforded the same opportunities and time for training as white employees and she was held to a higher, much less lenient standard, than were white employees of Novant.

125. Ms. Laing was qualified for the job she had with Novant and she was meeting Novant's legitimate expectations at the time of her termination.

126. Novant's claimed legitimate, non-discriminatory reasons for terminating Ms. Laing's employment after 6 weeks were pretext for Novant's racially motivated termination of Ms. Laing.

127. The manner in which Novant terminated Ms. Laing's employment was especially cruel and malicious given its accusations against Ms. Laing of stealing and falsifying patient records.

128. Novant made false and malicious allegations against Ms. Laing to preclude her, under Novant's self-established procedures, from appealing her termination.

129. As one of the largest health care employers in North Carolina, Novant knew or reasonably should have known that its actions would severely limit Ms. Laing's employment opportunities.

130. Upon information and belief, a Novant employee terminated for stealing and falsifying patient records would not be eligible for rehire by Novant to work at any of his numerous health care facilities in North Carolina.

131. Novant knew or reasonably should have known that its actions with respect to Ms. Laing would forever harm her career prospects and her ability to support her family.

## FIRST CLAIM FOR RELIEF
### (Discrimination in Violation of Title VII)

132. The allegations in the preceding paragraphs of the Complaint are incorporated herein as if fully set forth herein.

133. Novant terminated Ms. Laing's employment because of her race and/or color in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq*.

134. Ms. Laing is an African American / Black female who was performing her duties as a Certified Medical Assistant in a satisfactory matter. Ms. Laing was qualified for the job she had with Novant and she was meeting her employer's legitimate expectations.

135. As a result of Novant's actions, Ms. Laing has suffered lost wages, lost employment benefits, pain and suffering, inconvenience, mental anguish, emotional distress, humiliation, loss of enjoyment of life, and the loss of status and reputation.

136. Ms. Laing seeks remedies of back pay (with reinstatement or in lieu of reinstatement), front pay, compensatory damages, punitive damages, attorney's fees, and all other relief allowed by applicable law.

## SECOND CLAIM FOR RELIEF
**(Discrimination in Violation of 42 U.S.C. § 1981)**

137. The allegations in the preceding paragraphs of the Complaint are incorporated herein as if fully set forth herein.

138. Novant terminated Ms. Laing's employment because of her race in violation of 42 U.S.C. § 1981.

139. Novant intended to discriminate against Ms. Laing and, but-for Ms. Laing's race, Novant would not have terminated her employment as it did.

140. Novant acted with malice and/or reckless indifference to Ms. Laing's federally protected rights and, therefore, there should be an award of punitive damages.

141. Punitive damages are appropriate in this case to punish Novant for its treatment of Ms. Laing and/or to deter Novant and other employers like Novant from committing such conduct in the future.

## THIRD CLAIM FOR RELIEF
**(Wrongful Termination in Violation of Public Policy – N.C. Gen. Stat. § 143-422.2)**

142. The allegations in the preceding paragraphs of the Complaint are incorporated herein as if fully set forth herein.

143. North Carolina General Statute § 143-422.2 provides that the public policy of North Carolina protects the right of all persons to hold employment without discrimination on account of race.

144. Novant's termination of Ms. Laing on account of her race directly violated the express public policy of North Carolina.

145. Ms. Laing's termination was wrongful and in violation of North Carolina law.

146. Ms. Laing has suffered damages as a result of Novant's wrongful discharge of her employment in violation of North Carolina public policy.

147. As a result of Novant's actions, Ms. Laing has suffered lost wages, lost employment benefits, pain and suffering, inconvenience, mental anguish, emotional distress, humiliation, loss of enjoyment of life, and the loss of status and reputation.

148. Novant's conduct and that of its agents, described above, constitutes willful and wanton conduct within the meaning of N.C. Gen. Stat. §§ 1D-5(7) and 1D-15(a)(3) and conduct with malice within the meaning of N.C. Gen. Stat. §§ 1D-5(5) and 1D-15(a)(2), and accordingly Ms. Laing is entitled to recover punitive damages in accordance with the law and as may be determined by the trier of fact.

149. Novant's actions in terminating Ms. Laing's employment based on alleged stealing from Novant and falsifying patient records were egregious and were done with malice and in willful and wanton disregard of Ms. Laing's rights.

150. Novant knew, or reasonably should have known, that its actions in accusing Ms. Laing of stealing from Novant and falsifying patient records would likely result in injury, damage, and harm to Ms. Laing.

151. Novant's officers and/or managers participated in or condoned the conduct alleged herein constituting malice and willful and wanton conduct giving rise to punitive damages.

152. Ms. Laing seeks remedies of back pay, front pay, compensatory damages, punitive damages, attorney's fees, and all other relief allowed by applicable law.

## JURY TRIAL DEMAND

Plaintiff requests a jury trial on all matters subject to trial by jury.

WHEREFORE, Ms. Laing respectfully prays that the Court:

1. Enter judgment against Novant on Ms. Laing's federal claims and award Ms. Laing back pay (with reinstatement or in lieu of reinstatement), front pay, lost benefits, an appropriate amount for all compensatory damages, and other pecuniary and non-pecuniary losses, as well as punitive damages, costs, and attorney's fees as provided by law;

2. Enter judgement against Novant on Ms. Laing's state law claims and award Ms. Laing back pay (with reinstatement or in lieu of reinstatement), front pay, lost benefits, an appropriate amount for all compensatory damages, and other pecuniary and non-pecuniary losses, as well as punitive damages, costs, and attorney's fees as provided by law; and

3. Award Ms. Laing such other and further relief as the Court deems just and proper.

This the 7th day of November, 2022.

/s/ Deborah M. Mergner
N.C. State Bar No: 55769
Debbie@triadlawfirm.com

/s/ Daniel W. Koenig
N.C. State Bar No: 24357
Dan@triadlawfirm.com

HERING KOENIG PLLC
609-B Eugene Court
Greensboro, NC 27401
(p) (336)-560-7899
(f) (336) 217-8924
*Attorneys for Plaintiff*